## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## PADUCAH DIVISION
## CASE No. 5:18-cv-00032-TBR

BOB ANDERSON, Administrator of the
Estate of Charles Christopher McClure,
Deceased, and Next Friend of S.M., B.M.,
And C.M., Minor Daughters of Mr. McClure                                        PLAINTIFF

v.

CITY OF FULTON, KENTUCKY, *et al.,*                                        DEFENDANTS

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court upon Plaintiff Bob Anderson's Motion for Summary Judgment on Liability Against Defendant James R. Buckingham, II. [DN 74]. Defendants James R. Buckingham, II ("Buckingham"), Terry Powell ("Powell"), and City of Fulton, Kentucky have responded. [DN 96]. Plaintiff has replied. [DN 107]. As such, this matter is ripe for adjudication. For the reasons that follow, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment on Liability Against Defendant James R. Buckingham, II [DN 74] is **DENIED**.

Defendants have also filed a Motion for Summary Judgment. [DN 77]. Plaintiff has responded. [DN 100]. Defendants have replied. [DN 104]. Plaintiff subsequently filed a supplemental response. [DN 108]. Defendants filed a supplemental reply. [DN 109]. As such, this matter is also ripe for adjudication. For the reasons that follow, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [DN 77] is **GRANTED**.

Plaintiff filed a Motion to Strike Defendants' Motion for Summary Judgment. [DN 85]. Defendants responded. [DN 95]. This matter is ripe for adjudication. For the reasons that follow, **IT IS HEREBY ORDERED** that Plaintiff's Motion to Strike Defendants' Motion for Summary Judgment [DN 85] is **GRANTED IN PART AND DENIED IN PART**.

## I.  Background

The video evidence sets forth the following facts. Buckingham was informed over radio by Powell that McClure had broken Powell's windshield. [Bodycam Footage at 00:01]. Buckingham immediately begins driving towards the scene. [*Id.*] Powell then radios again stating McClure has broken another one of his windshields. [*Id.* at 00:31]. As soon as Buckingham arrives on the scene, McClure can be seen running with a pole with a knife attached in his hands. [*Id.* at 00:45]. Buckingham yells at McClure to "get back" and trains his gun on McClure. [*Id.*] As McClure runs away, Buckingham begins driving in McClure's direction. A few seconds later, Buckingham parks his car and gets out with his gun in his hand. [*Id.* at 01:06]. Shortly after Buckingham gets out of his vehicle, McClure can be seen running in Buckingham's direction with the pole raised. [*Id.* at 01:08]. McClure swings the pole in Buckingham's direction but makes contact with the rear windshield of the vehicle. [*Id.* at 01:09]. As McClure is swinging the pole, Buckingham shoots McClure. [*Id.*]

After McClure is shot, he falls to the ground and drops the pole. [*Id.*] The knife can be seen laying several feet away from McClure. [*Id.*] Buckingham approaches McClure, still with his gun pointed at McClure, and instructs McClure to "get down". [*Id.* at 01:13]. As Buckingham moves towards McClure, McClure begins to get up and turns in the direction of the pole only a few feet away from him. [*Id.* at 01:18]. Buckingham then shoots McClure a second time. [*Id.*] Buckingham then brings McClure to the ground and he is subsequently handcuffed after a brief struggle. [*Id.*]

## II. Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In determining whether summary judgment is appropriate, a court must resolve all

ambiguities and draw all reasonable inferences against the moving party. *See Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonable find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 252 (1986)). The plaintiff may accomplish this by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence…of a genuine dispute…" Fed. R. Civ. P. 56(c)(1). Mere speculation will not suffice to defeat a motion for summary judgment, "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

### III. Discussion

### A. Motion to Strike

The Court will first rule on Plaintiff's Motion to Strike. In Plaintiff's Motion, he first argues Defendants did not seek leave to file a motion in excess of the page limitations. Defendants' Motion for Summary Judgment is 34 pages which exceeds the limitation set by LR 7.1. However, Defendants have since filed a Motion for Leave to File Excess Pages and the Court granted that motion. [DN 102].

Plaintiff next argues Defendants' Motion for Summary Judgment relies upon irrelevant facts.

### 1. Autopsy blood panel

Plaintiff argues the blood panel is irrelevant because Buckingham was not aware of any drugs or alcohol in McClure's system when he shot McClure. Defendants argue blood panel evidence is relevant because it confirms Powell's and Buckingham's suspicion that McClure was under the influence of something. "A determination of the reasonableness of the defendant officers' conduct must take into account the fact that at the time of the fatal struggle, the defendant officers had reason to believe that [McClure] was either on drugs or mentally unstable. *Landis v. Baker*, 297 F. App'x 453, 465 (6th Cir. 2008). Defendants' perception of McClure's state is relevant. The autopsy blood panel supports Defendants' perception that McClure was under the influence. This evidence would bolster Defendants' opinion and is therefore relevant.

### 2. Affidavits of Third-Party Witnesses

Plaintiff argues the affidavits of third-party witnesses should be stricken because Buckingham did not talk to any of these witnesses prior to the shooting. Defendants attached four witnesses statements to their motion. All four individuals witnessed McClure's action prior to the shooting. According to Defendants, some of the affidavits are from individuals who called 911. The affidavits give context to the reasons police were called to the scene. These affidavits should not be stricken from the record.

### 3. Powell's dashcam video

Plaintiff argues Powell's dashcam video is not relevant because Buckingham did not view Powell's dashcam video prior to shooting McClure. However, Powell's dashcam is evidence of any potential threat McClure posed immediately before the shooting. Powell's dashcam gives

context to the circumstances for what the officers were called to the scene. Therefore, this evidence is relevant.

### 4. Powell's affidavit

Powell's affidavit has been the source of much argument. In Powell's affidavit he states he sustained cuts to his face from the windshield McClure broke and was treated at a hospital. Plaintiff refutes Powell's claim and argues Powell's affidavit is a "sham affidavit". Defendants have provided evidence that Powell was seen at Jackson Purchase Hospital on the day of the incident; however, this evidence does not show for what Powell was treated.

The Court will strike Powell's affidavit not because it is a sham affidavit but because there is currently no proof to support Powell's claim that he was treated for cuts sustained during this incident. Whether Powell was injured was not a determinative factor in the Court's findings. The potential threat McClure posed was determinative.

### 5. Williams' bodycam

Plaintiff argues Williams' bodycam footage is irrelevant because Williams did not arrive at the scene until after McClure was shot. However, Williams' bodycam is the only video that shows when the ambulance was called and when it arrives. This is relevant to Plaintiff's claims. Therefore, the evidence will not be stricken.

### 6. Side-by-side comparison of videos

Plaintiff again argues this video is not relevant. This side by side video compares Williams' bodycam footage with Powell's dashcam video. These videos are synced together and give a better understanding of when the ambulance was first requested. Again, this evidence is relevant to Plaintiff's claims and will not be stricken.

Plaintiff also states he was not provided a copy of this exhibit. Defendant responds that Plaintiff has received a copy of each individual video just not side-by-side. Plaintiff has received and had opportunity to review these videos just in a different format. The Court has reviewed this exhibit, but it did not materially alter the Court's finding. Therefore, the Court will not strike this exhibit.

### 7. Grand jury recording

Plaintiff argues the grand jury recording is now irrelevant because Defendants Stacy and Bell were dismissed from this case. Defendants argue the recording is relevant to Plaintiff's Hindrance of Prosecution claim. However, that claim, as discussed below, was dismissed for other reasons. The Court gave no consideration to the grand jury recording. Therefore, the recording will be stricken from the record, at this time.

Defendants' Motion for Summary Judgment will not be stricken from the records because even without the exhibits the Court will strike, there is sufficient evidence to grant Defendants' motion.

## B. Excessive Force Claim under 28 U.S.C. § 1983

In order to prevail on his § 1983 claim for excessive force, Plaintiff must establish that a constitutional violation occurred, and that Defendants are not entitled to qualified immunity. *Slusher v. Carson,* 540 F.3d 449, 453 (6th Cir. 2008). Because Defendants assert they are entitled to qualified immunity, the Court will first determine whether their actions were unconstitutional before turning to whether they are entitled to qualified immunity for any such violation.

### 1. Fourth Amendment Claim

The Fourth Amendment's prohibition against unreasonable seizures of a person applies in the context of an arrest or investigatory stop:

> The Fourth Amendment's prohibition against unreasonable seizures of the person applies to excessive-force claims that 'arise in the context of an arrest of investigatory stop of a free citizen,' while the Eighth Amendment's ban on cruel and unusual punishment applies to excessive force claims brought by convicted criminals serving their sentences. When neither the Fourth nor the Eighth Amendment serves to protect citizens, courts have applied the Fourteenth Amendment.

*Aldini v. Johnson,* 609 F.3d 858, 864 (6th Cir.2010) (citations omitted). "Relevant factors to consider in evaluating what level of force is reasonable include the 'severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight .'" *Id.* (alteration in original) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Still, the Sixth Circuit advises that "[t]hese factors are not an exhaustive list, and the ultimate inquiry is whether the seizure was reasonable under the 'totality of the circumstances.'" *Id.* (quoting *Ciminillo v. Streicher*, 434 F.3d 461, 467 (6th Cir.2006)). Additionally, the "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene rather than with the benefit of hindsight. *Caie v. W. Bloomfield Twp.*, 485 F. App'x 92, 95 (6th Cir.2012) (citing *Graham*, 490 U.S. at 396). This means that courts must take into account "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* (quoting *Graham*, 490 U.S. at 397). "Ultimately, however, the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 397).

### a. First Shot

#### i. Severity of the crime

Prior to Buckingham arriving on scene, he was notified that McClure had broken two windows on Chief Powell's police vehicle and McClure had struck another vehicle. [BodyCam Footage at 0:03-0:32]. Prior to the first shot, McClure can be seen running with the pole with a knife attached in his hand as Buckingham arrives on scene. [*Id.* at 0:45]. Neither of these acts alone is particularly severe or serious. However, when the Court considers the surrounding circumstances, the severity does increase. McClure was not breaking windows of vehicles that were unoccupied. Both vehicles had passengers in them that could have been harmed. Plaintiff seeks to characterize McClure's actions as only a threat to property. However, prior to the first shot, McClure also posed a physical threat to Powell, the passenger in the maroon van, and any other individuals passing by. McClure can be seen running through the street and striking random vehicles. [Powell Dashcam at 03:00]. Although this was not the most severe crime, McClure was not harmless.

### ii.   Whether McClure posed an immediate threat to the safety of the officers or others

Plaintiff argues McClure did not pose an immediate threat to Buckingham because McClure was only using the pole with a knife attached to continue breaking windows. Plaintiff further argues that Buckingham shot McClure as soon as he saw him, and Buckingham could not have perceived and reacted to a threat. However, this ignores the fact Buckingham witnessed McClure running with the pole with a knife attached in his hand as soon as Buckingham arrived on scene. [BodyCam Footage at 00:44]. Buckingham instructs McClure to "get back" and McClure continues running. [*Id.*]

Buckingham exited his vehicle, with his gun in his hand, at 01:07. [BodyCam Footage at 01:07]. One second later, McClure can be seen running around a police vehicle, towards Buckingham, with the pole with knife attached raised. [*Id.* at 01:08]. Buckingham raised his gun

8

after McClure can be seen. [*Id.*] The view is somewhat blocked but it can be seen that McClure swung in Buckingham's direction but hit the rear window. [*Id.*] However, this is not determinative of this factor because the relevant question is whether Buckingham had probable cause to perceive McClure as an imminent threat.

From the time Buckingham got out of his car to the moment he first shot McClure took approximately two seconds. McClure appeared behind the police vehicle quickly and appeared to be running towards Buckingham with the pole and knife raised. In many of the cases Plaintiff cites to, video evidence of the entire encounter was not available.

Plaintiff cites to *Woodcock v. City of Bowling Green, Ky.,* to support his position. In *Woodcock,* officers had a long standoff with Gregory Harrison. A large portion of the events were recorded by dash-cam video. 165 F. Supp. 3d 563, 572 (W.D. Ky. 2016) *aff'd in part,* 679 Fed. App'x 419 (6th Cir. Feb 16, 2017). A call was placed to Bowling Green Police Department's administrative line. The caller stated, "Yes, I'm on my way to Louisville Bridge, I wanna beat the hell out of my brother, and if they want, KILL me". *Id.* at 571. Officer Casada, among other officers, was dispatched to the area. *Id.* at 571. When Casada was dispatched he was told Harrison was standing in a parking lot with a gun. *Id.* at 572. Harrison was intoxicated and held his left arm behind his back while waving his right arm in the air. *Id.* at 573. Harrison was repeatedly asked to put his hands up, stop moving, and was warned that he would be shot if he did not cooperate. *Id.* at 574. For the majority of the encounter, Harrison stood in one place and did not approach officers. *Id.* After Harrison continued to refuse to obey officers' orders, Casada shot Harrison. *Id.* at 576. The actual shooting was not captured on dash-cam but it was determined that Harrison was 71.9 feet away from Casada and standing at a 45 degree angle. *Id.*

The Court found "Casada's use of deadly force was objectively unreasonable" due to Harrison not posing a serious threat to the safety of officers. *Id.* The officers on scene never witnessed Harrison with a gun even though dispatch warned he was armed with one. *Id.* at 585.

Plaintiff also cites to *Lopez v. City of Cleveland* to support his argument that summary judgment is not appropriate. In *Lopez,* police were informed that Lopez was threatening family members and had a baseball bat. 625 Fed. App'x 742, 743 (6th Cir. 2015). Police found Lopez sitting in the street with a beer bottle and holding a machete. *Id.* at 743-744. Lopez refused to drop the machete and officers shot Lopez with a taser. *Id.* at 744. The taser did not work on Lopez and officers drew their firearms. *Id.* More officers arrived on scene and tased Lopez but the tasers still did not work. *Id.* The rest of the facts were disputed and there was no video evidence to confirm what occurred. *Id.* Officers fired at Lopez and struck him three times. *Id.* The district court granted summary judgment to defendants. *Id.* at 745. The Sixth Circuit found that summary judgment was not appropriate because there were "genuine disputes of material fact regarding whether Defendant Officers used excessive force in shooting Lopez and whether they were entitled to immunity". *Id.*

The officers testified that they believed "Lopez posed a serious risk of harm to the officers or others." *Id.* at 746. The officers specifically testified that they believed one of Lopez's family members was in "imminent danger at the time they fired at Lopez." *Id.* The Court found there was a dispute regarding Lopez's movements prior to being shot. *Id.*

> "There is a dispute of fact as to whether Lopez made any movement in those final moments that could reasonably be interpreted as threatening". *Id.* "In this case, there are contentious factual disputes about the nature of Lopez's movements just before the shooting. Those disputes go to the heart of whether it was reasonable for Defendant Officers to use deadly force. Because the reasonableness of their actions depends on which version of the facts one accepts, the question must go to the jury."

*Id.* at 747.

Defendants cite to *Mitchell v. Schlabach*. In *Mitchell*, dispatch received a report that Mitchell had assaulted someone and was drunk driving. 864 F.3d 416, 419 (6th Cir. 2017). Dispatch contacted Schlabach about Mitchell. *Id.* Mitchell brought his vehicle to a stop in a parking lot and Schlabach pulled his police car up to Mitchell's driver side. *Id.* Mitchell sped away; leading Schlabach on a chase through residential neighborhoods at speeds over 100 miles per hour for ten minutes. *Id.*

> Ten minutes into the car chase, Mitchell ran his car into a roadside ditch in the middle of a national forest.
>
> Schlabach exited his vehicle into the pouring rain, drew his handgun, and began slowly approaching Mitchell. Schlabach claims that he gave loud, verbal commands as he approached Mitchell: "Stop, get down, get down on the ground, get down on the f-ing ground." In response, Mitchell turned around and began walking toward Schlabach. Schlabach described Mitchell as walking "aggressively"—that is, with "[c]lenched fists, wide eyes, coming directly in my— towards me, ... refusing to listen to any of my direct commands." And while the dash-cam video does not clearly show Mitchell's facial expressions or whether his fists were clenched, it leaves little room to doubt the hostility of Mitchell's approach. Indeed, Mitchell headed straight toward Schlabach with long, purposeful steps despite the fact that Schlabach was pointing a gun directly at him. Mitchell continued toward Schlabach even after Schlabach began backing away in fear. Schlabach stated in a deposition that while Mitchell was approaching him, "He told me I was gonna have to f- - -ing shoot him," which Schlabach took to mean, "if I didn't shoot him, he was gonna kill me ... [w]ith his fists, with his feet, with my gun, with anything he possibly could've gotten at the time."
>
> Schlabach took five hurried steps backward in an attempt to keep distance between himself and Mitchell. After Mitchell had pressed Schlabach all the way across the road and the gap between the two had narrowed to "somewhere between 10 and 21 feet," Schlabach fired a shot at Mitchell. Mitchell hunched over slightly but continued moving purposefully toward Schlabach. Less than one second after firing the first shot and after taking two more steps back, Schlabach fired again. After the second shot, Mitchell hunched over further and turned around.

*Id.* at 419-420. The district court found that Schlabach was entitled to qualified immunity because a constitutional violation did not occur and there was not a clearly established right. On appeal, the Sixth Circuit affirmed the decision.

11

The Court found Mitchell walked "toward Schlabach with speed, purpose, and confidence despite the fact that Schlabach had a gun trained on him. Mitchell continued charging toward Schlabach even as Schlabach changed trajectories and began backing away from him." *Id.* at 421-422. The video made it "clear that Mitchell intended a confrontation with Schlabach." *Id.* at 422. The video evidence left no question in the Court's mind as to what happened and what the officer could reasonable perceive. Both cases differ from the situation at issue.

Plaintiff argues there are "contentious factual disputes". Plaintiff states the video shows no warning was given by Buckingham before the shooting, Buckingham was 36-45 feet away from McClure, McClure never moved in Buckingham's direction, and McClure was holding the pole towards Buckingham's cruiser's rear window. [DN 100 at 14]. However, the video clearly contradicts Plaintiff's assertion that Buckingham was 36-45 feet away from McClure. McClure was only a few feet away when Buckingham shot him. Further, McClure was running towards Buckingham. The video shows McClure running or moving quickly toward Buckingham with the pole with a knife attached raised. He swung the pole toward in Buckingham's direction but hit the rear window of the vehicle. However, that fact does not change that McClure was running in Buckingham's direction with the weapon raised over his head. McClure's quick movements in Buckingham's direction with the pole raised "could reasonably be interpreted as threatening". When viewing all relevant facts, there is no factual dispute. Considering Buckingham was forced to make a split-second judgment, Buckingham had probable cause to believe McClure posed a threat at the moment of the first shot.

The circumstances here differ from both *Mitchell* and *Woodcock*. However, the Court finds this case is more similar to *Mitchell* than *Woodcock*. McClure was not standing still at the time of the first shot like Harrison. Nor was he charging Buckingham as Mitchell was prior to both shots.

However, prior to the first shot, McClure was running quickly in Buckingham's direction with a weapon. Unlike Harrison, McClure was seen holding a weapon. At the time of the second shot, McClure was on the ground and attempting to get up. [Bodycam Footage at 01:16]. The pole was a few feet away from McClure without the knife attached. [*Id.*] As McClure attempted to get up, Buckingham shot McClure at close range. [*Id.* at 01:18]. Although McClure did not charge Buckingham like Mitchell, he did move towards a weapon that presented a threat of harm to Buckingham.

### iii.   Whether the suspect is actively resisting arrest or attempting to evade arrest by flight

At the time of the first shot, McClure had been evading Powell. Powell had instructed McClure several times to put the knife down. [Powell Dashcam at 02:30; 02:50; 03:40].  Although he was not under arrest at that moment, he was disobeying police orders. Also, Buckingham ordered McClure to "get back" as soon as he arrived on scene and McClure continued to run with the pole with a knife attached in hand. All three factors weigh in favor of Buckingham.

### iv.   Other considerations

A court may give consideration to whether a warning has been given. However, a warning is not required.

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and *if, where feasible*, some warning has been given.

*Garner,* 471 U.S. at 11-12 (emphasis added). McClure was not warned immediately before Buckingham first shot him. However, he had been warned multiple times to put the knife and the pole down. [Powell Dashcam at 02:30; 02:50; 03:40]. It was not feasible for Buckingham to warn

McClure directly before the first shot. McClure was quickly running towards Buckingham with the pole and knife raised. In that split second, Buckingham could not have warned McClure. It was reasonable for Buckingham to believe McClure was swinging the pole at him and because of that a warning was not feasible.

Plaintiff also argues consideration of McClure's mental state shows Buckingham's actions were objectively unreasonable. "The diminished capacity of an unarmed detainee must be taken into account when assessing the amount of force exerted." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 904 (6th Cir. 2004). Although McClure was not unarmed at the time of the first shot, the Court should and will still give consideration to his mental state. Buckingham did have prior encounters with McClure. During these encounters, McClure was known to act erratically. [DN 84-2 at 19]. Buckingham stated they would calm McClure down by "talking to him" and letting him "vent". [*Id.* at 18]. However, he was never armed during these encounters. [*Id.* at 19].

Plaintiff cites to *Ali v. City of Louisville* to support his position that McClure should have been handled differently due to his mental state. In *Ali*, the Court stated, "persons with mental illness should be handled in calm manner. When officers do not handle them in this manner and use any force, violence between the officers and the person with mental illness will escalate." 395 F. Supp. 2d 527, 534 (W.D. Ky. 2005). The individual in *Ali* was "mentally or emotionally disturbed and was barricaded in an immobilized vehicle" when officers deployed pepper spray. *Id.* at 536. That presented a completely different situation than the one present here. Although McClure was experiencing some emotional disturbance, he also posed a clear threat to Buckingham in that moment. The Court cannot ignore the threat McClure posed because of the mental or emotional disturbance McClure was experiencing.

14

Finally, Plaintiff also asks this Court to consider whether Buckingham should have first tried non-lethal alternatives.  While the Fulton City Police Department does list several non-lethal alternatives officers can use, they are available at the discretion of the officer. The policy also states:

> NOTE: It is not the intent of this part of this procedure to direct officers to try each of the level options before escalating to the next. Each situation will dictate at which level a member will start.

Courts have held "police officers are under no obligation to decide instantaneously what less intrusive alternative exists to ensure that any threat ... will be neutralized." *Bullman v. City of Detroit, Michigan*, 787 F. App'x 290, 297 (6th Cir. 2019) (internal quotations omitted). Buckingham was not required to choose a non-lethal alternative. However, it is a consideration in determining the reasonableness in Buckingham's choice. Buckingham was equipped with a taser. [*Id.* at 28]. Buckingham was being approached by McClure armed with a pole with a knife attached to the end. Even Plaintiff has conceded that McClure "was initially armed with a deadly weapon". [DN 74 at 14]. Buckingham could not be required to deploy a non-lethal weapon when being confronted with a deadly weapon. Therefore, his decision to deploy his firearm rather than the taser was not unreasonable.

All factors weigh in Buckingham's favor. There is not genuine issue of material fact here. Buckingham's actions were objectively reasonable in light of the circumstances regarding the first shot.

**b. Second Shot**

After Buckingham shot McClure the first time, McClure fell, to the ground and dropped the pole. [Bodycam Footage at 01:11]. It can be seen on video that the knife was no longer attached to the pole and was out of McClure's reach. [*Id.*] Buckingham has testified that he was unaware

15

of the knife's location after he shot McClure the first time. [DN 84-2 at 40]. Buckingham approached McClure, who was still on the ground, with his gun trained on him and instructing him to "get down". [Bodycam Footage at 01:12]. The pole was on the ground only a few feet away from McClure. [*Id.* at 01:14]. As Buckingham got closer, McClure began to get up and turned toward the pole. [*Id.* at 01:17]. Buckingham shot McClure from close range. [*Id.*] After shooting McClure Buckingham grabbed McClure and brought him to the ground. [*Id.* at 01:19]. Buckingham's testimony that he was unsure of the location of the knife is supported by the video. After handcuffing McClure, officers began checking McClure for any weapons and Buckingham can be heard stating "I don't know where the knife went." [*Id.* at 01:51].

Plaintiff argues the "*Garner* standard doesn't even come into play when Buckingham shot McClure a second time, when McClure was clearly *un*armed." [DN 74 at 14]. Plaintiff correctly cites to a Sixth Circuit opinion that states:

> It cannot reasonably be contended that physically resisting arrest, without evidence of the employment or drawing of a deadly weapon, and without evidence of any intention on the suspect's part to seriously harm the officer, could constitute probable cause that the suspect poses an imminent danger of *serious* physical harm to the officer or to others.

*Bouggess v. Mattingly,* 482 F.3d 886, 891 (6th Cir. 2007). Although now it is clear that McClure was unarmed at the time of the second shot, the Court cannot ignore the fact McClure was recently armed with a deadly weapon and that weapon was only a few feet away from him. The Court finds a Fifth Circuit case to be persuasive.

In *Salazar-Limon v. City of Houston,* officer Thompson pulled Salazar over for weaving between lanes and speeding. 826 F.3d 272, 275 (5th Cir. 2016). Thompson asked Salazar to get out of the truck and Salazar complied. *Id.* Thompson attempted to handcuff Salazar, a struggle began, and Salazar pulled away. *Id.* Thompson pulled out his gun and ordered Salazar to stop. *Id.*

"Salazar did not immediately comply and took 'one or two' more steps." *Id.* "Thompson testified he then saw Salazar turn left and reach toward his waistband…[and Thompson] perceived the combination of Salazar's actions to be consistent with a suspect retrieving a weapon from his waistband." *Id.* Thompson shot once and hit Salazar. *Id.* It was later determined that Salazar was not armed. *Id.* The district court granted summary judgment for Thompson became there was no "evidence contradicting Thompson's testimony that he shot because, when Salazar reached for his waistband and turned toward him, he believed that Salazar had a gun and would shoot." *Id.* at 276.

The Fifth Circuit affirmed the district court's finding because Salazar never denied reaching for his waistband. *Id.* at 278-279. The Court further stated:

> Thus, based on our precedent and the undisputed facts, considering the totality of the circumstances—which include Salazar's resistance, intoxication, his disregard for Officer Thompson's orders, the threat he and the other three men in his truck posed while unrestrained, and Salazar's actions leading up to the shooting (including suddenly *reaching towards his waistband*)—it seems clear that it was not unreasonable for an officer in Officer Thompson's position to perceive Salazar's actions to be an *immediate* threat to his safety. And, it follows that it was not 'clearly excessive' or 'unreasonable' for Officer Thompson to use deadly force in the manner he did to protect himself in such circumstances.

*Id.* at 279. Thompson had no indication that Salazar was armed other than him reaching for his waistband. Here, Buckingham knew McClure was armed with a pole and a knife seconds before. Further, Buckingham witnessed McClure moving towards the pole. Although this is a close call, McClure's previous erratic behavior and him turning towards the pole constituted a real and immediate threat to Buckingham. Therefore, the second shot was objectively reasonable.

## 2. Qualified Immunity

Pursuant to qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

known." *Feathers v. Aey*, 319 F.3d 843, 847-48 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "While the Supreme Court does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Cleveland,* 2019 WL 1058154, at *7 (internal quotations omitted).

"It has been clearly established in this circuit for some time that individuals have a right not to be shot unless they are perceived as posing a threat to officers or others." *Jacobs v. Alam*, 915 F.3d 1028, 1040 (6th Cir. 2019) (quoting *King v. Taylor,* 694 F.3d 650, 664 (6th Cir. 2012)).

### i.  Buckingham

Plaintiff cites to *Scozzari v. Miedzianowski,* to support his argument that qualified immunity should be denied. In *Scozzari,* Police Chief Dwayne Miedzianowski responded to a call reporting gun shots near the Lone Pine Motel. 454 Fed. App'x 455, 457 (6th Cir. 2012). Miedzianowski witnessed Scozzari walking near the motel carrying a backpack, flashlight, and a stick or a cane. *Id.* Miedzianowski asked Scozzari to drop the stick and to come closer, but Scozzari responded, 'F--- you, boy' and continued walking." *Id.* Miedzianowski suspected Scozzari fired the earlier reported shots. *Id.* Scozzari returned to his home, Cabin 17, and Officers Miedzianowski and McGraw followed him. *Id.* at 458. Both officers testified Scozzari opened the cabin door with a knife in one hand and a hatchet in the other held over his head. *Id.* McGraw fired a taser at Scozzari but it was ineffective. *Id.* Scozzari went back into the cabin and shut the door. *Id.* The door reopened and Scozzari was standing in the doorway still holding the knife and hatchet. *Id.* Scozzari began walking towards McGraw and once he was "within two to four feet of McGraw, Miedzianowski fired four shots at Scozzari from about ten feet away." *Id.* Scozzari then turned towards Miedzianowski and McGraw fired seven rounds. *Id.*

Several witnesses were present on the scene and their version of the shooting drastically contradicted the officers'. Witnesses remembered the officers being 10 to 20 feet away from Scozzari when they shot him. *Id.* at 459. One witnesses even testified that Scozzari was unarmed and an officer placed the weapons near Scozzari's body. *Id.* at 460.

The Court found there were "genuine issues of material fact whether Scozzari was wielding a knife and hatchet over his head." *Id.* at 463. "According to Miedzianowski, Scozzari walked or took 'a couple steps' in McGraw's direction; other witnesses recalled Scozzari moving slowly or not at all." *Id.* "In contrast to *Chappell,* the circumstances here present a genuine question whether the situation compelled a split-second decision to use lethal force." *Id.*

Plaintiff also cites to *Cleveland v. Louisville Metro Government*. However, that case is also distinguishable from the present case for similar reasons. In *Cleveland,* the officers shot Wicker while standing 15.9 and 17.6 feet away from Wicker. 2019 WL 1058154, *6 (W.D. Ky March 6, 2019). Although Wicker was armed with a saw, there was dispute about how he used the saw. The officers testified that Wicker was swinging the saw back and forth while Plaintiffs' expert testified the saw "remained at his side, pointed downward." *Id.* at 3. These disputes created a genuine issue and precluded the Court from granting qualified immunity to the officers.

Here, there is no dispute regarding the distance between Buckingham and McClure. McClure was a few feet away from Buckingham when Buckingham first shot. It is also clear that McClure was swinging the pole with a knife in the direction of Buckingham but hit the rear windshield of the vehicle near Buckingham at the time of the first shot. Although McClure did not hit Buckingham, McClure was quickly running towards Buckingham with the pole with a knife raised. It was objectively reasonable for Buckingham to believe McClure was an imminent threat to his safety.

The cases cited by Plaintiff exhibit different circumstances. Plaintiff has not cited to a case where the decedent and the officer were in close proximity, the decedent was running in the direction of the officer, with a weapon raised, and qualified immunity was denied. Plaintiff also does not cite to any case law showing a decedent that was recently armed, moves towards the weapon, and qualified immunity was denied. Therefore, the Court finds Buckingham is entitled to qualified immunity for both shots.

### ii. Powell

Plaintiff argues Powell is not entitled to qualified immunity because he submitted a perjured affidavit. Plaintiff argues Powell committed perjury when he stated he was treated at Jackson Purchase Medical Center for cuts to his face in his affidavit. In Defendants' reply they attached a document titled Health Insurance Claim Form which purports to support Powell's testimony that he was treated for cuts. [DN 104-2]. While the form does show Powell was treated on January 16, 2017—the day of the incident—it does not show for what he was treated. Defendants have since filed medical records from Jackson Purchase Medical Center; however, the records are completely redacted. [DN 119-5]. Even if the Court agreed with Plaintiff's argument that Powell provided a perjured affidavit, it does not change the Court's finding. Whether Powell was injured is not determinative in this case. The immediate threat posed by McClure was the justification for the shooting. Whether Powell was injured does not create a genuine issue of *material* fact in this case.

Plaintiff next argues Powell falsified testimony regarding the arrival of the ambulance. Plaintiff argues Powell's testimony that the ambulance was in Martin, Tennessee when requested is a "blatant falsification of the record and an attempt to mislead the Court to absolve Powell of liability and to minimize his indifference to the dying McClure." [DN 100 at 26].

Approximately 9 seconds after the second shot was fired, Powell reports shots were fired over the radio. [Defendants' Exhibit O at 01:29]. He requests an ambulance approximately 6 seconds later. [*Id.* at 01:35]. Approximately two minutes later, an officer can be heard asking "where's the ambulance at". [Bodycam Footage at 03:18]. Officers then repositioned McClure on the ground to help with his breathing. [*Id.* at 03:55]. A few seconds later, Buckingham asks where the ambulance is again. [Williams Bodycam at 04:16]. Shortly after, an officer checks to see whether an ambulance was dispatched. [*Id.* at 05:17]. Dispatch responds that an ambulance was not dispatched to the scene and the officer then requests one again. [*Id.* at 05:23]. The ambulance can be seen arriving on Williams' bodycam. [*Id.* at 14:59].

During his deposition, Powell was asked if he ever determined why the ambulance took so long to arrive. He stated, "After the fact, I had found that I believe they was in Martin, Tennessee, is what I heard so…yeah. They's probably about 18 miles." [DN 84-3 at 40]. According to the EMS report, the ambulance only traveled six miles to the scene. [DN 100-3]. The report further states that dispatch was notified at 12:26 but the unit was not notified until 12:36. [*Id.*] However, the ambulance arrived six minutes after being notified. [*Id.*] Based on the report, it is not true that the ambulance was in Martin, Tennessee. However, that alone is not proof that Powell falsified testimony. Plaintiff provides no proof that Powell knew the ambulance was not in Martin. Powell testified that he was told the ambulance was in Martin and Plaintiff provides no evidence that Powell was not in fact told that. Therefore, these arguments cannot be the basis of denying Powell qualified immunity.

## C.  Federal claims against City of Fulton, Kentucky and official capacity claims

Defendants argue the official capacity claims brought against Buckingham and Powell must be dismissed because the City of Fulton is named as a defendant. Defendants also argue the

21

claims against the City of Fulton should be dismissed because there was not violation of McClure's rights and because there is no respondeat superior liability under § 1983. "In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).

Plaintiff does not respond to any arguments regarding claims against the City of Fulton. "When a party fails to respond to a motion or argument therein, the Sixth Circuit has held that the lack of response is grounds for the district court to assume opposition to the motion is waived and grant the motion." *Lewis-Smith v. W. Kentucky Univ.*, 85 F. Supp. 3d 885, 915 (W.D. Ky. 2015), *aff'd* (Jan. 12, 2016) (citing *Humphrey v. U.S. Att'y Gen.'s Office,* 279 Fed. App'x. 328, 331 (6th Cir. 2008). Therefore, the Court will dismiss all claims against the City of Fulton, Kentucky.

**D.  State Claims**

**1.  Negligence and Gross Negligence**

"Under Kentucky law, common law negligence requires proof of the following elements: (1) a duty owed by the defendant to the plaintiff; (2) breach of that duty; (3) injury to the plaintiff; and (4) legal causation between the defendant's breach and the plaintiff's injury." *Earle v. U.S.,* 2016 WL 1417811, *2 (E.D. Ky. Apr. 11, 2016) (citing *Wright v. House of Imports, Inc.*, 381 S.W.3d 209, 212 (Ky. 2012)).

Plaintiff does not respond to Defendants' argument that Powell is entitled to summary judgment on the negligence claims. Again, the Court will dismiss these claims against Defendant Powell. *See Lewis-Smith,* 85 F. Supp. 3d at 91.

Plaintiff argues Buckingham's violation of KRS 503.090 constitutes negligence *per se*. KRS 503.090 describes what type of force by a police officer is justifiable. This statute does not create a claim for negligence *per se*.

> The statute in question does not provide for a cause of action for damages based upon its violation and, therefore, under Kentucky law, the plaintiff must necessarily rely on K.R.S. § 446.070 for recovery:
>
> > A person injured by the violation of any statute may recover from the offender such damages as he sustained by reason of the violation, although a penalty or forfeiture is imposed for such violation.
>
> K.R.S. § 446.070. This latter statute has been described by the Kentucky Supreme Court as "merely codif[ying] the common law concept of negligence per se.... [and] applies only if the alleged offender violated a statute and the plaintiff was in the class of persons which that statute was intended to protect." *Davidson v. American Freightways, Inc*., 25 S.W.3d 94, 99–100 (Ky.2000). The Kentucky Supreme Court further stated in Davidson that "if the defendant was not in the class of persons whose conduct was intended to be regulated by the statute, the defendant could not violate the statute and KRS 446.070 simply would not apply." *Id*. at 100.
>
> In the present case, the statute that the plaintiff relies on, K.R.S. § 503.090, does not appear to be one that was intended to regulate conduct. While it does address the conduct of law enforcement officers, the statute merely provides a defense against a claim of excessive force and sets forth the elements of that defense. K.R.S. § 503.020 ("In any prosecution for an offense, justification, as defined in this chapter, is a defense."). Therefore, the principles of negligence per se—and, thus, K.R.S. § 446.070—do not come into play to create a cause of action for the plaintiff.

*Clark v. Kentucky*, 229 F. Supp. 2d 718, 728–29 (E.D. Ky. 2002). Plaintiff argues Buckingham's actions "'constituted bad faith' and there is 'sufficient evidence showing that a jury could conclude that Buckingham's use of force violated' McClure's rights." [DN 100 at 28]. However, this Court has already found Buckingham was justified in shooting McClure. At the moment of the first shot it was reasonable for Buckingham to believe McClure was an immediate threat to his life. Although the analysis is a much closer call regarding the second shot, McClure was moving towards a weapon at the moment of the second shot. Buckingham was justified in believing McClure was

again a threat to his life. Therefore, Buckingham did not breach any duty owed to McClure and these claims must be dismissed.

Further, "a police officer's use of excessive force [cannot] be analyzed as a negligence claim." *Ali,* 2006 WL 2663018 at 8.

> The officer is liable for the intentional tort of battery, not for negligence, when he deliberately exceeds the privileged amount of force by committing an unwarranted violence on the arrestee. *See Gray,* 499 S.W.2d at 75.
>
> There is no such thing as a negligent battery. *See* Rest. (Second) TortsS § 13. Where the officer may have mistakenly believed that he needed to use the amount of force that he did, that does not change the fact that initial action was intentional, or alter the objective analysis of whether the force he ultimately used was excessive. Thus, where an unwanted touching (a battery), which is inherent in any arrest, escalates beyond that which is reasonably necessary into excessive force, the cause of action is solely for battery, with the officer's privileged use of force ending when the excessive force began. To permit a separate claim for negligence creates the risk that a jury would assume that, even if no excessive force were used, the officer might somehow still be liable for some undefined negligence. Such a result is doctrinally unsupportable and unacceptable, because each time an officer uses force, he commits an intentional act of battery for which he is liable, unless he is clothed by a privilege permitting him to use a reasonable amount of force (e.g., that articulated in *Gray*, 499 S.W.2d at 74 (interpreting Ky Rev. Stat 431.025(3)), or Ky.Rev.Stat. 503.050, 503.070, 503.090).

*Id.* Therefore, even if the Court determined Buckingham used excessive force, Plaintiff's negligence claim could not survive.

### 2. Battery

Under Kentucky law, a battery is "any unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him." *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky.2000). A police officer is privileged to use the amount of force that he reasonably believes is necessary to overcome resistance to his lawful authority; however, when he deliberately exceeds the privileged amount of force he is liable for the tort of battery. *Ali*, 2006 WL 2663018, at *8 (W.D .Ky. Sept. 18, 2006) (citing *City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky.1973)).

Defendants argues that summary judgment is warranted because Buckingham only used reasonable and necessary force to effect Plaintiff's arrest.

This Court has previously determined that Buckingham's actions were reasonably appeared to be necessary in that moment. Therefore, the battery claim must also be dismissed.

### 3.   **Wrongful Death and Loss of Consortium**

"Whenever the death of a person results from an injury inflicted by the negligence or wrongful act of another, damages may be recovered for the death from the person who caused it, or whose agent or servant caused it. If the act was willful or the negligence gross, punitive damages may be recovered. The action shall be prosecuted by the personal representative of the deceased." KRS 411.130.

As previously explained, McClure's death did not result from a wrongful act. His death resulted from a reasonable act by Buckingham. A claim for loss of consortium only exists where a wrongful death claim is also pending. *Lambert v. Farnklin Real Estate Co.,* 37 S.W.3d 770, 780 (Ky. App. 2000) ("In summary, based upon the context of *Giuliani,* its language, and the absence of a direct holding that the loss of parental consortium is available beyond wrongful death cases, *Giuliani* is best read as providing a cause of action to a child only in those cases whether there is likewise an action for the wrongful death of the parent."). Therefore, both claims must be dismissed.

### 4.   **Hindrance of Prosecution, and Abuse of Public Office**

Plaintiff does not respond to any arguments regarding these claims. "When a party fails to respond to a motion or argument therein, the Sixth Circuit has held that the lack of response is grounds for the district court to assume opposition to the motion is waived and grant the motion."

*Lewis-Smith,* 85 F. Supp. 3d at 915 (citing *Humphrey v. U.S. Att'y Gen.'s Office,* 279 Fed. App'x. 328, 331 (6th Cir. 2008). Therefore, the Court will dismiss these claims.

### IV. Conclusion

For the above stated reasons, **IT IS HEREBY ORDERED** that:

1. Plaintiff's Motion for Summary Judgment [DN 74] is **DENIED.**

2. Defendants' Motion for Summary Judgment [DN 77] is **GRANTED**.

3. Plaintiff's Motion to Strike [DN 85] is **GRANTED IN PART AND DENIED IN PART**.

4. Defendants' Exhibit I and Q shall be **STRICKEN** from the record.

5. Defendants' Motion to Substitute Affidavit [DN 118] is **DENIED AS MOOT**.

6. Defendants' Motion for Leave to File Sur-Reply [DN 126] is **DENIED AS MOOT**.

7. Plaintiff's Motion to Exclude Defendants' Expert [DN 76] is **DENIED AS MOOT**.

8. Defendants' Motions to Exclude Plaintiff's Expert [DN 79, 80] are **DENIED AS MOOT**.

A judgment will follow.

**IT IS SO ORDERED**.

**Thomas B. Russell, Senior Judge**
**United States District Court**

November 30, 2020

cc: counsel